A89A2016, A89A2017. ATLANTA OBSTETRICS & GYNECOLOGY GROUP, P.A. et al. v. ABELSON et al.; and vice versa.
(392 SE2d 916)

CARLEY, Chief Judge.

The relevant facts are as follows: In March of 1985, the then 36-year-old Mrs. Jon Abelson and her husband (hereinafter referred to as Plaintiffs) discovered that Mrs. Abelson was pregnant. Throughout the pregnancy, prenatal care was provided by Dr. William Tippins and Atlanta Obstetrics & Gynecology Group, P.A. (hereinafter referred to as Defendants). In October of 1985, Plaintiffs' daughter was born with Down's Syndrome. After the birth of their daughter, Plaintiffs filed this medical malpractice action, alleging that Defendants had breached the applicable standard of care by failing to provide advice concerning the increased risks of genetic abnormalities associated with higher maternal age, and by failing to have performed an amniocentesis so as to detect whether the unborn child had Down's Syndrome. The complaint further alleged that, if an amniocentesis had been performed which showed the unborn child's Down's Syndrome, plaintiffs would have opted for an abortion.

After answering, Defendants moved to dismiss the complaint for failure to state a claim. The trial court denied this motion. Thereafter, in the context of Defendants' motion in limine, the trial court made various rulings as to the damages that Plaintiffs would be entitled to seek. The trial court certified for immediate review its order on the motion in limine and Defendants applied for an interlocutory appeal. The application was granted and, in Case No. A89A2016, Defendants appeal from the trial court's order on their motion in limine. In Case No. A89A2017, Plaintiffs cross-appeal.

*Case No. A89A2016*

1. Defendants enumerate as error the denial of their motion to dismiss the complaint for failure to state a claim.

The complaint purports to state a claim for "wrongful birth." As distinguished from a "wrongful pregnancy" claim, a "wrongful birth" claim is asserted by plaintiffs who wished to become parents, but who were not apprised that their child would be born with a foreseeable birth defect or other congenital ailment. See *Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441 (314 SE2d 653) (1984). In those states wherein the legislature has not acted, "most courts . . . have been

more receptive to the parents' wrongful birth claims, after the Supreme Court's legalization of abortion in 1973, and there is by now quite general agreement that the parents should be permitted to recover at least their pecuniary losses. . . ." Prosser & Keeton on Torts, § 55, p. 371 (5th ed. 1984). The judicial recognition of the viability of a "wrongful birth" claim has not, however, been universal. See *Azzolino v. Dingfelder*, 337 SE2d 528 (N.C. 1985); *Wilson v. Kuenzi*, 751 SW2d 741 (Mo. 1988). Georgia has previously recognized the viability of a "wrongful pregnancy" claim. *Fulton-DeKalb Hosp. Auth. v. Graves*, supra. However, neither the legislature nor the appellate courts of this State has previously addressed the issue of the viability of a "wrongful birth" claim. Accordingly, the determination of whether the trial court correctly denied Defendants' motion to dismiss the complaint for failure to state a claim presents an issue of first impression, and we must decide whether or not Georgia subscribes to the "general agreement" that a "wrongful birth" claim is viable.

In addressing the issue of the viability of a "wrongful pregnancy" claim, our Supreme Court noted that "[t]he United States Supreme Court . . . has recognized that a woman has the right to plan the size of her family. . . . It has been suggested that recognition of a ['wrongful pregnancy'] cause of action would open the door to fraudulent claims, that the injury is remote from the negligence, that recovery would be out of proportion to the defendant's culpability. But these same arguments have been made in connection with countless other tort claims, and the problems presented have been dealt with in the course of traditional tort litigation. [Cit.]" *Fulton-DeKalb Hosp. Auth. v. Graves*, supra at 442-443 (1). In addressing the issue of the viability of a "wrongful birth" claim, at least one court has suggested that the problems presented by such a claim cannot be dealt with in the course of traditional tort litigation. See *Azzolino v. Dingfelder*, supra. Therefore, we perceive the resolution of the issue to be dependent upon whether a "wrongful birth" claim can be said to be within the parameters of traditional Georgia tort principles, as is true with a "wrongful pregnancy" claim, or whether a "wrongful birth" claim, unlike a "wrongful pregnancy" claim, falls outside the parameters of those traditional principles.

The traditional tort elements of duty and breach present no difficulties. As in any malpractice action, the standard of care owed by a physician to prospective parents and a deviation therefrom must be established by medical experts. Accordingly, recognizing the viability of a "wrongful birth" claim will "not require a physician to identify and disclose every chance, no matter how remote, of the occurrence of every possible birth 'defect,' no matter how insignificant. [Cit.]" *Smith v. Cote*, 513 A2d 341, 347 (N.H. 1986). It is presumed that

medical services have been performed in an ordinarily skillful manner but, if expert medical testimony can be adduced to establish that it is a deviation from the standard of care and skill ordinarily employed by the medical profession generally to fail to test for, diagnose, and disclose to prospective parents the possible existence of a specific birth defect in their child, then malpractice as defined by OCGA § 51-1-27 would have been shown. Indeed, a refusal to recognize the existence of an actionable breach of a physician's duty in the face of such medical evidence would itself constitute a deviation from traditional tort principles. Any further contention that the instant "wrongful birth" claim is premised upon Defendants' alleged breach of a duty merely to secure the Plaintiffs' informed consent, which duty was not imposed upon physicians under Georgia law at the times relevant to this case, is without merit. Defendants' non-disclosure "did not relate to any affirmative treatment, but rather to the condition of pregnancy itself." *Karlsons v. Guerinot*, 394 NYS2d 933, 939 (N.Y. App. Div. 1977). Had Defendants actually performed an amniocentesis without disclosing to Plaintiffs the specific risks, if any, of undergoing that procedure, that non-disclosure might have constituted Defendants' non-actionable failure to have secured Plaintiffs' informed consent. However, Defendants' failure to have disclosed the risks of *not* undergoing amniocentesis as an element of prenatal care afforded to Plaintiffs, if otherwise shown to have been negligent under the existing circumstances, would constitute actionable malpractice under OCGA § 51-1-27.

Defendants urge that a "wrongful birth" claim is outside the parameters of traditional tort principles because the birth of a child is not a legally cognizable "injury." See *Azzolino v. Dingfelder*, supra. The birth of Plaintiffs' daughter is clearly not, in and of itself, an injury to them. See *Fulton-DeKalb Hosp. Auth. v. Graves*, supra. Indeed, it would be anomalous to hold that the birth of a child would not constitute an injury to parents who had undertaken to prevent conception, but that it would constitute an injury to parents who were desirous of having a child. However, the mother in *Graves* could allege that she had been economically injured by the unplanned birth only to the extent of incurring those ordinary child-raising expenses which would be incurred by any parent. Plaintiffs, on the other hand, allege no injury by virtue of incurring the ordinary expenses of rearing their planned child but, rather, an economic injury to the extent of incurring the extraordinary child-rearing expenses resulting from her foreseeable birth defect. Thus, unlike the mother in *Graves*, Plaintiffs do not allege that the birth of their child is, in and of itself, an economic injury to them. They "allege, at a minimum, that but for [Defendants'] negligence they would not be burdened by extraordinary medical and education expenses associated with the treatment of

[Down's Syndrome]. That monetary burden is no different from medical or rehabilitation expenses associated with any personal injury, and, contrary to *Azzolino's* suggestion, we need not find that 'life, even life with severe defects,' constitutes a legal injury in order to recognize [Plaintiffs'] claim for relief." *Lininger v. Eisenbaum*, 764 P2d 1202, 1206 (Colo. 1988).

Defendants further urge that the traditional element of causation cannot be proven because it cannot be shown that they either caused or prevented the cure of Down's Syndrome in Plaintiffs' child. See *Wilson v. Kuenzi*, supra. However, it is not alleged that Defendants negligently caused Down's Syndrome in Plaintiffs' child. It is alleged that Defendants negligently failed to disclose to Plaintiffs the risks of not undergoing amniocentesis so as to diagnose Down's Syndrome in the unborn child and that, but for that negligent failure, Plaintiffs would not have been injured by incurring the extraordinary expenses of rearing a Down's Syndrome child. It is true that, notwithstanding Defendants' alleged negligence, Plaintiffs would still have incurred those extraordinary expenses had an abortion not been performed. While recognizing the existence of moral, ethical and religious arguments which can be marshalled against abortion, the judiciary is nevertheless also bound to recognize that, within certain limitations, the right to seek an abortion currently exists as a matter of constitutional law. Accordingly, if Plaintiffs can show that, but for Defendants' alleged negligence, an amniocentesis could and would have been performed so as to determine Down's Syndrome and that a legal abortion subsequently could and would have been obtained, the causation element will have been satisfied. See *Smith v. Cote*, supra at 347; *Proffitt v. Bartolo*, 412 NW2d 232 (Mich. App. 1987). To the extent that Plaintiffs cannot show that a legal abortion could and would have been obtained, the causation element will not have been satisfied, because the tort of "wrongful birth" is viable only to the extent that abortion is an allowable legal option which the injured Plaintiffs would have exercised. *Proffitt v. Bartolo*, supra at 238.

Likewise, the element of damages does not present an insurmountable hurdle to recognition of a "wrongful birth" claim. "[D]ifficulty in calculating damages is not a sufficient reason to deny recovery to an injured party. [Cit.] Other courts have recognized that the complexity of the damages calculation in a wrongful birth case is not directly relevant to the validity of the asserted cause of action. [Cit.]" *Smith v. Cote*, supra at 347-348.

Accordingly, we hold that, like a "wrongful pregnancy" claim, a "wrongful birth" claim is within the parameters of traditional Georgia tort principles. "Such an action is no more than a species of malpractice which allows recovery from a tortfeasor in the presence of an injury caused by intentional or negligent conduct." *Fulton-DeKalb*

*Hosp. Auth. v. Graves,* supra at 443 (1). It follows that the trial court did not err in denying Defendants' motion to dismiss the complaint for failure to state a claim.

2. On Defendants' motion in limine, the trial court held that the extraordinary expenses of raising Plaintiffs's Down's Syndrome child were recoverable. Defendants enumerate this ruling as error.

Because the birth of a child, in and of itself, is not an injury to the parents, the Supreme Court in *Graves* held that ordinary child-rearing expenses are not recoverable in a "wrongful pregnancy" case. However, the Supreme Court expressly stated that *Graves* was "not one of those cases which involves foreseeability of the possible birth of a child with a birth defect or other congenital defect. Therefore, we cannot reach the issue of measure of damages in such a case." *Fulton-DeKalb Hosp. Auth. v. Graves,* supra, 442. Accordingly, we do not construe *Graves* as authority for the proposition that extraordinary child-rearing expenses are not recoverable in a "wrongful birth" case. "The reasons for denying the costs of rearing a . . . child [without foreseeable birth defects resulting from a physician's negligence] should not prevent the parents of an abnormal child [with such a foreseeable birth defect] from recovering expenses reasonably necessary for the care and treatment of their child's . . . impairment." *Goldberg v. Ruskin,* 471 NE2d 530, 536 (Ill. App. 1984). See also *Fassoulas v. Ramey,* 450 S2d 822, 824 (4) (Fla. 1984). "A special rule of damages has emerged; in most jurisdictions the parents may recover only the extraordinary medical and educational costs attributable to the birth defects. [Cit.] In the present case, in accordance with the rule prevailing elsewhere, [Plaintiffs seek] to recover, as tangible losses, only [their] extraordinary costs. . . . Although the extraordinary costs rule departs from traditional principles of tort damages, it is neither illogical nor unprecedented. The rule represents an application in a tort context of the expectancy rule of damages employed in breach of contracts cases. Wrongful birth plaintiffs typically desire a child (and plan to support it) from the outset. [Cit.] It is the defendants' duty to help them achieve this goal. When the plaintiffs' expectations are frustrated by the defendants' negligence, the extraordinary costs rule 'merely attempts to put plaintiffs in the position they *expected* to be in with defendant's help.' [Cit.]. . . . We note . . . that contract principles are hardly unknown in medical malpractice litigation, which has roots in contract as well as in tort. [Cits.] In light of the difficulty posed by tort damages principles in these circumstances, we see no obstacle — logical or otherwise — to use of the extraordinary costs rule. [Cit.]" (Emphasis in original.) *Smith v. Cote,* supra at 349.

Accordingly, we hold that the plaintiffs in a "wrongful birth" case may recover the extraordinary medical and education costs attributa-

ble to their child's foreseeable birth defect, that is, the cost of supporting a child with such a defect reduced by the cost of rearing a child without such a defect. See *Smith v. Cote*, supra; *Phillips v. United States*, 575 FSupp. 1309, 1317 (D.S.C. 1983).

3. The trial court also ruled that Plaintiffs could recover extraordinary child-rearing expenses for the entire life expectancy of the child. Defendants urge that this ruling is erroneous.

The tort of "wrongful birth" is committed against the parents, not the child. Accordingly, it is Plaintiffs' obligation to provide support for their child, not their child's need for support, that is the relevant benchmark. The parental obligation to support is dependent not only upon the life expectancy of the child but, also, upon the life expectancy of Plaintiffs themselves. To the extent that the child can be expected to outlive Plaintiffs, she would have no right of support from them. To the extent that Plaintiffs can be expected to outlive their child, they would have no obligation to support her. Accordingly, it is only to the extent that the life expectancy of the child *coincides* with the life expectancies of Plaintiffs that a parental obligation to support can be said to exist. It necessarily follows that it is that coincidental period of time, not merely the life expectancy of Plaintiffs' child, that establishes the extent of Defendants' liability for extraordinary child-rearing expenses. The trial court erred in ruling otherwise.

Defendants urge that in no event should they be liable for extraordinary child-rearing expenses past the eighteenth birthday of Plaintiffs' child. It is true that the parental obligation to support a child generally ends at the child's eighteenth birthday. There is, however, an exception. A parental obligation to support exists if the adult child is completely destitute. See OCGA § 36-12-3; *Citizens & Southern Nat. Bank v. Cook*, 182 Ga. 240 (185 SE 318) (1936). Accordingly, to the extent that Plaintiffs can prove that the coincidental period of their and their child's life expectancies is in excess of eighteen years and that their child's Down's Syndrome is such that she will otherwise become a completely destitute adult, they will be entitled to recover extraordinary child-rearing expenses for that coincidental period.

4. The trial court failed to hold that the benefit derived from the society and comfort provided by Plaintiffs' child should be set-off against any recoverable extraordinary child-rearing expenses. Defendants urge that the trial court erred in failing to hold that such a set-off should be made.

In *Graves*, the Supreme Court held that such a set-off would have no bearing upon the determination of whether ordinary child-rearing expenses should be recovered in a "wrongful pregnancy" case. "This approach has been criticized because the benefit rule . . . con-

templates a benefit to the same interest of plaintiff which was harmed. Since injury generally claimed is economic, the benefit of love and companionship arguably does not go to the same interest. [Cit.] *We agree that the economic consequences attendant to the birth and rearing of a child are burdens which differ in species from the benefits which flow from joys a child brings to a family.* Use of the offset provided by the benefit rule appears to be an attempt to apply the theory of consequential damages and consequential benefits to human life and parenthood. We are not willing to impose such a theory in this area of delicate human relations." (Emphasis supplied.) *Fulton-DeKalb Hosp. Auth. v. Graves,* supra at 444 (3). By the same token, such a set-off should have no bearing in a "wrongful birth" case wherein it is compensation for the economic injury of extraordinary child-rearing expenses that is being claimed. Accordingly, the trial court did not err in failing to hold that the emotional benefits derived by Plaintiffs from their child should be set-off against any recoverable extraordinary child-rearing expenses.

5. The trial court correctly denied Defendants' motion to dismiss the complaint. The trial court also correctly denied Defendants' motion in limine as to the recoverability of extraordinary child-rearing expenses without a set-off, but erred in denying the motion in limine as to the recoverability of such expenses for the entire life expectancy of Plaintiffs' child.

## Case No. A89A2017

6. Defendants have moved to dismiss this cross-appeal by Plaintiffs. However, an appeal which has been properly taken from an interlocutory order, such as Defendants' main appeal, has the same procedural status and dignity as an appeal from a final judgment. *Lawrence v. Whittle,* 146 Ga. App. 686, 687 (2) (247 SE2d 212) (1978). It follows that Plaintiffs clearly have the right to pursue a cross-appeal pursuant to OCGA § 5-6-38 (a). The motion to dismiss is, therefore, denied.

7. The trial court granted Defendants' motion in limine as to Plaintiffs' recovery of damages for their mental and emotional distress. Urging that they are entitled to recover such damages in a "wrongful birth" action, Plaintiffs' enumerate this ruling as error.

Plaintiff's claim for mental and emotional distress was properly denied on the basis of the "impact" rule. See *Ob-Gyn Assoc. of Albany v. Littleton,* 259 Ga. 663 (386 SE2d 146) (1989). It is true that, unlike *Littleton,* the instant case "arises from a child's birth, not a child's injury or death. Nonetheless, we are struck by the parallels between the claims for emotional distress in [*Littleton*] and the claim before us. Moreover, we are mindful of the anomaly that would result

were we to treat parental emotional distress as compensable. The negligent conduct at issue in [cases such as *Littleton* is] the direct cause of injuries to or the death of otherwise healthy children. By contrast, in wrongful birth cases the defendant's conduct results, not in injuries or death, but in the birth of an unavoidably impaired child. It would be curious, to say the least, to impose liability for parental distress in the latter but not the former cases. . . . We hold that damages for emotional distress are not recoverable in wrongful birth actions. [Cits.]" *Smith v. Cote*, supra at 351.

To the extent that Plaintiffs' claims for emotional distress can be construed to arise from the pregnancy and delivery rather than the actual birth of their child, the trial court likewise correctly granted Defendants' motion in limine. Plaintiffs wanted to become parents "and the pregnancy and delivery in connection with [their daughter] were no more difficult than if [she] had been normal." *Moores v. Lucas*, 405 S2d 1022, 1026. (Fla. App: 1981).

8. The trial court prohibited the questioning of Defendants' expert witnesses as to any alleged bias or financial interest resulting from their status as insureds of Defendants' insurance company. The enumeration of this ruling as error is controlled adversely to Plaintiffs by *Thomas v. Newnan Hosp.*, 185 Ga. App. 764, 766-67 (1) (365 SE2d 859) (1988).

*Judgment affirmed in part and reversed in part in Case No. A89A2016. Judgment affirmed in Case No. A89A2017. McMurray, P. J., Pope and Cooper, JJ., concur. Birdsong, J., concurs in the judgment only. Sognier and Beasley, JJ., concur in part and dissent in part. Deen, P. J., and Banke, P. J., dissent.*

BEASLEY, Judge, concurring in part and dissenting in part.

Upon reconsideration pursuant to Rule 48, it is necessary to dissent in part.

1. I concur in Division 1 primarily because of the applicability of *Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441 (314 SE2d 653) (1984), and the legislated broadness of OCGA §§ 51-1-27; 9-3-70; and 51-1-6. The rationale of the Supreme Court governs the circumstances here as well. I note that this would be a compensable tort only to parents who would abort.

2. Despite this court's acceptance of the calculability of damages for the tort in question, the first problem with damages is to identify the nature of recoverable damages in this tort. Defining what the tortfeasor will be liable for, in terms of species of damages, presents difficulty.

Considering the state of the law in Georgia with *Fulton-DeKalb Hosp. Auth.*, supra, in mind, I find no authority in law or logic to allow the award of extraordinary child-rearing expenses. I must dis-

sent from Division 2, and inasmuch as the ruling in Division 4 would then be upon a moot point, I find it necessary to dissent from Division 4 also.

It is true that the Supreme Court expressly noted in Graves' case that it did not involve "foreseeability of the possible birth of a child with a birth defect or other congenital ailment." Id. at 442. Such a statement does not imply that extraordinary costs or any other particular species of damages would be legally cognizable. In our determination of whether the so-called "extraordinary costs" are recoverable, we must examine the Supreme Court's rationale regarding usual child-rearing costs. Its consideration of that aspect of the case as a proposed species of damage when the birth of the child was unwanted mandates the exclusion of "extraordinary" child-rearing costs in this case as well.

To allow such monetary costs, assuming they could be calculated within a legal quantum, they would have to be " 'on the ground that human life and the state of parenthood are compensable losses.' " With respect to ordinary child-rearing expenses, the Supreme Court adopted this position and the following further reasoning from *Cockrum v. Baumgartner*, 95 Ill2d 193, 200 (447 NE2d 385, 389), cert. den. sub nom. *Raja v. Michael Reese Hosp. & Med. Center*, 464 U. S. 846 (104 SC 149, 78 LE2d 139) (1983): " 'In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization.' " *Fulton-DeKalb Hosp.*, supra at 444. This must relate to all expenses, because the law does not value life based on how much it costs to support it.

The determination that the law should not reach into a realm which requires the measurement of human life value forecloses a facing of the same dilemma when addressing the costs of raising a congenitally imperfect human being. It requires saying that this child, unwanted during the period before birth if defective but now in life and not a fetus, is worth less than a child unwanted altogether during that same correlative period of gestation. Otherwise, what is the distinction between awarding ordinary costs and extraordinary costs? What is the basis or ground or reason for the latter when there is no basis or ground or reason acceptable in Georgia law for the former? Certainly there is an emotional one. Perhaps there is a moral one. There is no doubt that there are humane ones.

In deciding that extraordinary child-raising expenses are recoverable, a ground for the distinction is not articulated. Is it that the value of a Down's Syndrome child's life is lesser? It may be lesser to these parents, who would have extinguished it before birth, but that would not be a proper measure under the rationale of the Supreme

Court. Besides, we have recognized in the majority opinion that "[t]he birth of Plaintiffs' daughter is clearly not, in and of itself, an injury to the [the parents]." And yet certain damages arising from the life which follows that non-injury of birth are being allowed.

These parents, and of course no parents, want their child to be congenitally handicapped. It is in human terms a tragic, burdensome and heartbreaking occurrence. But to say that those foreseeable costs which would be over and above the costs of raising a "normal" child should be recoverable even though the negligent defendants were not even remotely connected with the defect giving rise to the extraordinary expenses, defies logic.

That is true unless ordinary costs, too, are recoverable. The reason is that the tort here claimed resulted in a child (with child-rearing expenses) instead of a non-child (with zero child-rearing expenses). The alleged tort did not result in a defective child (with particular defect-related child-rearing expenses) instead of a normal child (with lesser child-rearing expenses).

We have held that the doctors may be held liable for the birth itself, if they proximately caused it. Yet the Supreme Court's ruling means that they cannot be held liable for the ordinary child-rearing costs, because of the value of human life.

By the same token, they are liable for the birth of Brittany, but not for her Down's Syndrome. Since the parents cannot recover for ordinary child-rearing expenses, there is no foundation upon which they could recover for extraordinary expenses related to her special condition. "But for" the defendants' negligence, there would have been no Brittany, no child at all, *not* a normal child. Reliance on *Lininger v. Eisenbaum*, 764 P2d 1202, 1206 (Colo. 1988), is weak because unlike Georgia there was no case law in that state holding that ordinary costs are not recoverable. The Supreme Court of Colorado specifically stated: "In this case, the Liningers do not request damages for the costs ordinarily associated with raising a healthy child, and we need not decide whether those costs may be recovered." Id. at 1207, fn. 8.

Plaintiffs are not seeking ordinary child-rearing expenses, but that may not be bootstrapped into holding that they would therefore be entitled to expenses beyond those. They could not obtain ordinary expenses even if they prayed for such, because of Graves' case. Ms. Graves did not want *any* child-rearing expenses in that she did not want *any* child. The Supreme Court did not find this to be a reason for compensability. No more could the extraordinary expenses be bottomed on the fact that plaintiffs did not want, or were not prepared to accept, the extraordinary expenses of a handicapped child.

I do not agree that "unlike the mother in *Graves*, Plaintiffs do not allege that the birth of their child is, in and of itself, an economic

injury to them." They must, because they allege that but for the negligence there would have been *no* child-rearing expenses. Brittany's affliction with Down's Syndrome could not be divorced, by due medical care, from her very being and constitution.

The majority refers to its extraordinary expenses allowance as a "special rule of damage." It is not even complete, as it permits, either arbitrarily or for policy reasons, only extraordinary medical and education costs; no other of what might be labeled extraordinary costs, such as child care beyond what a normal child would need, are included. More importantly, it being a "special rule," we on this Court have no authority to fashion it, in light of the *Graves* case.

3. With respect to Division 3, I cannot agree that defendants in this lawsuit involving a now four-year-old child (less than two when suit was filed) can be held liable to the parents for "extraordinary child-rearing expenses" past the child's eighteenth birthday, which is the age of majority. OCGA § 39-1-1 (a).

In this State, the duty of each parent is "to provide for the maintenance, protection, and education of his [or her] child until the child reaches the age of majority." OCGA § 19-7-2. See *Wilcox v. Wilcox*, 242 Ga. 598, 599 (250 SE2d 465) (1978); *Crawford v. Kalman*, 166 Ga. App. 712, 713 (305 SE2d 442) (1983). As pointed out by the Supreme Court in *Crane v. Crane*, 225 Ga. 605, 607 (1) (170 SE2d 392) (1969): "There is no exception provided for and this Court cannot make any. The General Assembly might conceivably make an exception as to children who are born mentally ill and remain so beyond majority or who become ill later on in life and remain so after reaching majority." This has not been done. Compare OCGA § 19-11-43 (2) (Uniform Reciprocal Enforcement of Support Act); *Ray v. Ray*, 247 Ga. 467, 468 (277 SE2d 495) (1981) (applying Act intrastate).

The only legal obligation beyond that point is imposed by OCGA § 36-12-3, which requires support of any adult "pauper contemplated by Code Section 36-12-2, if [the parent is] sufficiently able." The latter provides that "[n]o person who is able to maintain himself by labor or who has sufficient means shall be entitled to the benefits of the provision for the poor." Eighty-odd years ago the Supreme Court recognized that this meant "only those persons . . . who were completely destitute." *Clark v. Walton*, 137 Ga. 277, 279 (73 SE 392) (1911); *Crane*, supra at 607 (2). A person who had a parent "able to support" him or her would not be a "pauper." Id. at 280.

Both that case and *Citizens and Southern Nat. Bank v. Cook*, 182 Ga. 240 (185 SE 318) (1936), the case cited by the majority, involved adults and a *present* duty, if they were paupers, to support them. Neither these cases, nor the statute upon which they are dependent, contemplate a present duty to support a potential adult pauper, when the person is still a child. In order for the statutory

duty to arise, the person must in fact be an adult pauper.

Damages may not be remote or speculative. OCGA § 51-12-8. See representative cases at Cobb & Eldridge, Georgia Law of Damages, p. 100, fn. 3. For a jury to determine whether the parents or either of them will have a duty to support Brittany after she is eighteen is just that. There are too many "if's," too many unknowns: If either parent is alive, if either parent is able, if Brittany is alive, if Brittany is able, if Brittany has any independent resources, if the then-state of the medical and social sciences cannot enable her, and how long each of the three will be in life and able. I perceive no current obligation or even a certain future obligation imposed by the law for adult-age support which would render such support an "injury" to the parents so that the medical defendants could currently be held liable therefore in damages. The law does not create such a duty, and for the court to fashion one under the circumstances of this case would result in the necessity for a jury to compute remote and speculative damages.

In this regard the trial court did not err.

Insofar as Division 4 of the majority opinion is meant to apply to the damages ruled on in Division 3 as well as those in Division 2, it follows that I dissent from the Division 4 ruling as well, as the question addressed would be moot.

4. I concur in Divisions 5 through 8.

I am authorized to state that Judge Sognier joins in this opinion.

DEEN, Presiding Judge, dissenting.

*Fulton-DeKalb Hosp. Auth. v. Graves,* 252 Ga. 441 (314 SE2d 653) (1984), dealt only with a cause of action for an alleged "wrongful pregnancy." That case did not deal with a claim for an alleged "wrongful birth." Whatever else was decided by *Graves,* it is clear that five out of seven justices agreed on or stated the following at 442, 443, and 444: "An action brought *by a child* against the parents or *physician* on the theory that because of his illegitimacy or *birth defects* he would have been better not born has found *almost no support in the law. . . .* We instinctively recoil from the notion that *parents* may suffer a *compensable injury* on the *birth of a child. . . .* The soundness of a rule *denying recovery* for the *cost of raising a child* lies in that, given the values cherished by our society, *a parent cannot be said to have suffered an injury in the birth of a child.*" (Emphasis supplied.)

Georgia should follow the judicial recognition of the notion of non-viability of any alleged "wrongful birth" claims, as has been adopted in states such as North Carolina and Missouri. See, e.g., *Azzolino v. Dingfelder,* 337 SE2d 528 (N. C. 1985); *Wilson v. Kuenzi,* 751 SW2d 741 (Mo. 1988). Acknowledging that the action in the instant case is labeled "wrongful birth," nevertheless, our state seems to

recognize that life is valuable and supports a "rightful birth" or preservation of life position. See and compare *Emory Univ. v. Porubiansky*, 248 Ga. 391, 393-394 (282 SE2d 903) (1981); *Jefferson v. Griffin &c. Hosp. Auth.*, 247 Ga. 86, 90 (274 SE2d 457) (1981); *McAuley v. Wills*, 164 Ga. App. 812, 814 (298 SE2d 594), aff'd 251 Ga. 3 (303 SE2d 258) (1983); *Peace v. Weisman*, 186 Ga. App. 697, 700, 705 (368 SE2d 319) (1988).

While defendants' failure to have disclosed the risks to the parents of not undergoing amniocentesis as an element of prenatal care would otherwise be actionable, under the rule adopted in *Azzolino* and in *Graves*, the claim for "wrongful birth" is outside the parameters of traditional tort principles. As there is no "legally cognizable injury," ergo, it follows there can be no cause of action or recovery. Any duty under the new informed consent laws requiring disclosure of risks was not imposed at times relevant in this case. This point is thus not here considered.

The practice of medicine and the practice of law are generally considered as inexact sciences. See *Blount v. Moore*, 159 Ga. App. 80 (282 SE2d 720) (1981); *Jackson v. Rodriquez*, 173 Ga. App. 211 (325 SE2d 857) (1984). To permit a claim or cause of action for a "wrongful birth" would place an onerous burden on the medical profession of giving unlimited and unnamed tests of all kinds and descriptions to prospective mothers, and, in my opinion, would be contrary to (a) statutory law, (b) case law, and (c) public policy of our state. The antithesis of "wrongful birth" is "premature death," or "rightful death," and with this new policy espoused in the majority opinion, I cannot agree. The motion to dismiss the complaint for failure to state a claim should have been granted by the trial court; therefore, I must respectfully dissent.

I am authorized to state that Presiding Judge Banke joins in this dissent.

DECIDED MARCH 16, 1990 —
REHEARING DENIED MARCH 30, 1990 —

*Alston & Bird, Judson Graves, Bryan A. Vroon*, for appellants.
*Keenan Law Firm, Don C. Keenan, David S. Bills*, for appellees.
*Jones, Brown & Brennan, Taylor W. Jones, Myles E. Eastwood*, amici curiae.